# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**PATRICIA REMENTER,**

                **Plaintiff,**

**-vs-**                                **Case No.  6:04-cv-1148-Orl-22JGG**

**METROPOLITAN LIFE INSURANCE
COMPANY,**

                **Defendant.**

_____

## REPORT AND RECOMMENDATION

This cause came on for oral argument on November 9, 2005, on the following motions:

| | |
|---|---|
| **MOTION:** | **PLAINTIFF REMENTER'S MOTION FOR SUMMARY JUDGMENT (Docket No. 29)** |
| **FILED:** | **August 1, 2005** |

**THEREON** it is **RECOMMENDED** that the motion be construed as a motion for final judgment and **DENIED**.

| | |
|---|---|
| **MOTION:** | **DEFENDANT METLIFE'S MOTION FOR SUMMARY JUDGMENT (Docket No.  30)** |
| **FILED:** | **August 1, 2005** |

**THEREON** it is **RECOMMENDED** that the motion be construed as a motion for final judgment and **GRANTED**.

I.     **THE PARTIES**

Plaintiff Patricia Rementer ["Rementer"] sues Defendant Metropolitan Life Insurance Company ["MetLife"] under the Employee Retirement Income Security Act ["ERISA"], 29 U.S.C. §§ 1001, et seq.  Sears, Roebuck and Co. is Rementer's employer, and also the Plan Administrator and sponsor that established and maintains the Sears Group Long-Term Disability Plan ["the Plan"], an ERISA-covered employee welfare benefit plan.[1]  See Docket No. 31-6 at 11; Docket No. 31-3 at 4.  As Plan Administrator, Sears caused the Plan to purchase a group disability insurance policy from MetLife, an insurer and Claims Administrator.[2]  Docket No. 31-6 at 11; Docket No. 31-4 at 9.

Rementer, a plan participant, claims that MetLife wrongfully terminated her benefits under the Plan, and seeks to recover those benefits through this law suit.  MetLife contends that it properly terminated Rementer's benefits.  The matter is now before the Court on cross motions for summary judgment.  Based on the claim record before the claims administrator, each party claims entitlement to judgment as a matter of law.

II.    **ERISA AND THE STANDARD OF REVIEW**

In reviewing the parties' cross motions for summary judgment in an ERISA case, the outcome may depend on selecting the proper standard of review.  Specifically, the outcome may

---

[1] In 29 U.S.C. § 1002, Congress defines the terms "employee welfare benefit plan;" "employer;" "participant;" "administrator;" and "plan sponsor."  In 29 U.S.C. § 1102 (a), Congress defines the term "named fiduciary."  *See also* 29 U.S.C. § 1133 (review of claim denial by named fiduciary).  As a fiduciary, MetLife must "discharge its duties with respect to the plan solely in the interest of the participants and beneficiaries."  *See* 29 U.S.C. §§ 1004 (a) and 1109.

[2] In 29 U.S.C. § 1101 (b)(2), Congress defines the term "insurer," and states that a plan's assets include a guaranteed benefit policy, but  "shall not, solely by reason of the issuance of such policy, be deemed to include any assets of such insurer."  Plan assets which consist of insurance policies are exempt from the general rule that all benefit plan assets must be held in trust by one or more trustees.  29 U.S.C. § 1103; 29 C.F.R. § 2550.403b-1 (a)(1).

depend on 1.) whether this Court draws inferences from the evidence in the light most favorable to the non-movant, and resolves all reasonable doubts in that party's favor; or 2.)  whether this Court instead employs a highly deferential standard of review that looks only to whether the Claims Administrator's decision was arbitrary and capricious.  The United States Court of Appeals for the Eleventh Circuit has decided a number of cases applying each of the two standards (as well as an intermediate standard in the event of a conflict of interest), but no case that clearly directs which standard to apply.

### A.    THE STANDARD OF REVIEW FOR BENEFIT DENIALS

A plan participant may bring a civil action under ERISA to recover benefits due to her under the terms of the plan.  29 U.S.C. § 1132 (a)(1)(B).  The ERISA statute, however, does not specify the standard for reviewing benefit determinations made by plan administrators and fiduciaries.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 80 (1989); *Williams v. BellSouth Telecomms., Inc.*, 373 F.3d 1132, 1138 (11th Cir. 2004).

In enacting ERISA more than thirty years ago, Congress intended that benefit plan assets, as a general rule, would be held in trust by one or more trustees.  *See* 29 U.S.C. § 1103 (a) (benefit plan assets to be held in trust); *accord*, 29 C.F.R. §§ 2550.403a-1.  Although traditional trust law requires a deferential standard of review whenever a trustee has exercised discretionary powers, the wholesale importation of the fiduciary law's deferential arbitrary and capricious standard into ERISA cases is unwarranted.  *Firestone*, 489 U.S. at 109, 111.  The wisdom of the Supreme Court's hesitancy always to defer in ERISA cases is most apparent on review of a benefit plan whose only asset is an insurance policy — a plan that permits an employee of an interested

-3-

insurance company to make benefit determinations instead of a trustee.  *See* 29 U.S.C. § 1103 (b)

(insurance policies excepted from general rule requiring trustees); *accord*, 29 C.F.R. § 2550.403b-

1 (a)(1).

The ERISA statute nowhere suggests that a plan administrator must accord special

deference to the opinions of treating physicians, and imposes no heightened burden of explanation

on an administrator who rejects a treating physician's opinion.  *Black & Decker Disability Plan v.*

*Nord*, 538 U.S. 822, 831 - 32 (2003).   In reviewing the denial of plan benefits, the district court

therefore will not routinely defer to the opinions of a claimant's treating physician, and will not

import Social Security disability standards into the federal common law interpreting ERISA.  *Id.*

The Congress and Secretary of Labor are best positioned to resolve intelligently such questions of

routine deference.  *Id*.  It makes no difference if the Court is concerned that plans have repeatedly

retained consulting physicians who have a financial incentive to make a finding of "not

disabled,"or is concerned that treating physicians might favor their patients with a finding of

"disabled."  *Id*. at 832.

The Eleventh Circuit has set forth a six-step analysis for use in reviewing  ERISA-plan

benefit denials:

> (1) Apply the *de novo* standard to determine whether the claim
> administrator's benefits-denial decision is "wrong" (*i.e.*, the court
> disagrees with the administrator's decision); if it is not, then end the
> inquiry and affirm the decision.
>
> (2) If the administrator's decision in fact is "*de novo* wrong," then
> determine whether he was vested with discretion in reviewing
> claims; if not, end judicial inquiry and reverse the decision.

(3) If the administrator's decision is "*de novo* wrong" and he was vested with discretion in reviewing claims, then determine whether "reasonable" grounds supported it (hence, review his decision under the more deferential arbitrary and capricious standard).

(4) If no reasonable grounds exist, then end the inquiry and reverse the administrator's decision; if reasonable grounds do exist, then determine if he operated under a conflict of interest.

(5) If there is no conflict, then end the inquiry and affirm the decision.

(6) If there is a conflict of interest, then apply heightened arbitrary and capricious review to the decision to affirm or deny it.

*Williams*, 373 F.3d at 1138 (footnotes omitted).

Applying the *Williams* analysis, if the district court finds the administrator's decision was "wrong," the court next determines whether the administrator was vested with discretion in reviewing claims. To determine whether the administrator was vested with discretion, the district court assesses whether the plan language confers the requisite discretionary authority to determine eligibility and construe terms. *See Firestone Tire & Rubber Co.,* 489 U.S. at 115; *Kirwan v. Marriott Corp.*, 10 F.3d 784, 785, 789 (11th Cir. 1994) (it is error to apply the arbitrary and capricious standard, rather than *de novo* standard, where a plan lacks express unambiguous language giving the administrator discretionary authority to determine eligibility for benefits or construe the plan's terms).

If the administrator has been vested with discretion, the court next evaluates whether the administrator's decision was arbitrary and capricious. The arbitrary and capricious standard

generally[3] requires the district court to look only to the facts known to the administrator at the time the decision was made to deny coverage. *Lee v. Blue Cross*, 10 F.3d 1547, 1550 (11th Cir. 1994).

If the decision was arbitrary and capricious, the district court must determine whether the administrator has a conflict of interest. A conflict of interest exists, for example, when an insurance company administers a plan that pays benefits out of the insurance company's own assets. *Brown v. Blue Cross and Blue Shield of Ala., Inc.*, 898 F.2d 1556, 1561 (11th Cir. 1990). If a plan participant demonstrates a "substantial conflict of interest" on the part of the fiduciary responsible for benefits determinations, the burden shifts to the fiduciary to prove that its interpretation of the plan was not tainted by self-interest. *Brown,* 898 F.2d at 1566.

Nevertheless, "a wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries." *Godfrey v. BellSouth Telecomms., Inc.*, 89 F.3d 755, 758 (11th Cir. 1996); *Brown,* 898 F.2d at 1566-67; *Lee,* 10 F.3d at 1550. The Court may nevertheless defer if the administrator can show a plausible justification — such as a benefit to other beneficiaries or a routine practice. *Brown*, 898 F.2d at 1568; *Williams*, 373 F.3d at 1138. Even a conflicted administrator should receive deference when he demonstrates that he is exercising discretion among choices which reasonably may be considered to be in the interests of the participants. *Brown*, 898 F.2d at 1568; *Williams*, 373 F.3d at 1138. Heightened arbitrary and

---

[3]Exceptions may exist, but not in this case. As stipulated by the parties, the record is limited to the record before the Claims Administrator.

capricious review applies to both plan interpretations and factual determinations. *Torres v. Pittston Co.*, 346 F.3d 1324, 1332 (11th Cir. 2003).

### B.   THE *CELOTEX* STANDARD FOR SUMMARY JUDGMENT

MetLife argues that the usual rules of summary judgment do not apply in this case. Although the matter is before the Court on cross motions for summary judgment, MetLife argues the Court should treat the matter like an appellate review of an administrative decision. *See Curran v. Abbott Labs. Extended Disability Plan,* No. 04-14097, 2005 WL 894840 at *7 (11th Cir. March 16, 2005) (unpublished per curium decision);[4] *Leahy v. Raytheon Co.,* 315 F.3d 11, 17 (1st Cir. 2002);[5] *Bendixen v. Standard Ins. Co.*, 185 F.3d 939, 942 (9th Cir. 1999); *Providence v. Hartford Life & Acc. Ins. Co.*, 2005 WL 418778 at *1 (M.D. Fla. Jan. 12, 2005)(Hon. James Whittemore); *Bruce v. Metropolitan Life Ins. Co.*, Case No. 6:04-cv-482-Orl-22JGG (M. D. Fla. September 28, 2005)(Hon. Anne C. Conway)(Docket No. 31 at 30); *Smorto v. 3DI Technologies, Inc.*, 2005 WL 1227713 at *6, Case No. 04-cv-31-Orl-31JGG (M.D. Fla. May 23, 2005)(Hon. Gregory A. Presnell).  MetLife further argues that the motion for summary judgment is merely the method of bringing the legal issues before the district court and that the usual tests of summary judgment, such as applying inferences in the non-movant's favor, do not apply. *See Bendixen*, 185 F.3d at 942; *see also Leahy,* 315 F.3d at 17-18;  *Providence*, 375 F.Supp. 2d at 1342 n.1; *Bruce*, Case No. 04-cv-482-Orl-22JGG, Docket No. 31 at 30; *Smorto*, 2005 WL 1227713 at *6 - *8, *10.

---

[4]Pursuant to 11th Cir. R. 36-2 and I.O.P. 6, unpublished decisions are cited as persuasive authority, not as binding precedent.

[5]Under *Leahy*, district courts in the First Circuit must defer to the plan administrator without independently weighing the proof, and must ask "whether the aggregate evidence, viewed in the light most favorable to the non-moving party, could support a rational determination that the plan administrator acted arbitrarily in denying the claim for benefits." 315 F.3d at 18.

The United States Court of Appeals for the Eleventh Circuit has long held that motions for summary judgment involving ERISA claims are analyzed pursuant to *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  *See Brown v. Blue Cross & Blue Shield of Ala., Inc.*, 898 F.2d 1556, 1559 (11th Cir. 1990) (*citing Barfield v. Brierton*, 883 F.2d 923, 933 (11th Cir. 1989)); *Clark  v. Coats & Clark, Inc.*, 929 F.2d 604, 607-09 (11th Cir. 1991); *Lordmann Enterprises, Inc. v. Equicor, Inc.*, 32 F.3d 1529, 1532 (11th Cir. 1994); *Northlake Reg. Med. Ctr. v. Waffle House Sys. Employee Benefit Plan*, 160 F.3d 1301, 1303 (11th Cir. 1998); *HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co.,* 240 F.3d 982, 991 (11th Cir. 2001); *Hamilton v. Allen-Bradley Co., Inc.,*  244 F.3d 819, 823, 824 (11th Cir. 2001).  MetLife argues that these cases merely recite the *Celotex* standards in *pro forma* fashion, and that *Bendixen* and *Leahy* represent the current and growing trend that *Celotex* does not apply to motions for summary judgment in ERISA cases. Certainly, there are published Eleventh Circuit decisions that do not discuss the *Celotex* standards, but rather proceed directly to review the decision as described in *Williams*.  Indeed, even the panel in *Williams* reviewed a district court's order granting summary judgment.  *Williams*, 373 F.3d at 1134.  In reaching the cited decisions, however, the Eleventh Circuit panels never expressly considered whether to apply the *Celotex* standards.

Since *Williams*, the Eleventh Circuit has issued four unpublished opinions (three of them *per curiam* opinions) resolving ERISA summary judgment issues.  The first of these is *Curran*, on which MetLife relies.  The *Curran* decision cites *Leahy* for the proposition that the district court is to act more like an appellate tribunal than a trial court, and is to evaluate the reasonableness of the administrative decision in light of the record before the plan fiduciary.  *Curran*, 2005 WL 894840

*7, *9 ("the district court correctly used a deferential review standard and the proper review of a summary judgment motion under ERISA").  Despite this seeming disavowal of the *Celotex* standards, the *Curran* decision concluded that the opposing party "failed to show genuine issues of material facts to preclude summary judgment under the proper review standard."  *Id*. at *9.

Two of the unpublished decisions, *Potter v. Liberty Life Assurance Co. of Boston*, No. 03-16373, 2005 WL 1163628 (11th Cir. May 18, 2005), and *Salter v. Cont'l  Cas. Co*., No. 04-16246, 132 Fed. Appx. 337 (11th Cir. May 25, 2005), applied both *Celotex* and *Williams*.  In *Potter*, the court ruled that the district court erred in granting summary judgment for a plan administrator without resolving inferences in favor of the non-moving party.  2005 WL 1163628 *3 - *4, n.2.  Similarly, the *Salter* Court held that, after drawing all factual inferences in a light most favorable to the non-moving plan participant, the district court properly granted summary judgment for the insurer because the plan participant had failed to show a material issue of fact as to whether she was totally disabled as defined by the insurance policy.[6]  132 Fed. Appx. at 338.

The district court is constrained by Eleventh Circuit law first to apply the *Celotex* standards in analyzing a denial of benefits under an ERISA plan on summary judgment.  Throughout the analysis on summary judgment, the district court must construe the evidence in the light most favorable to the non-moving party.  *Potter*, 2005 WL *4 - *5, n.2, *6 - *7; *Salter,* 132 Fed. Appx. at 339.  After completing its analysis under the summary judgment standard, the Court then may

---

[6]The last of the four unpublished decisions, *Mordecai v. Standard Ins. Co.*, No. 04-14852, 2005 WL 2249896 (11th Cir. Sept. 16, 2005), did not address *Celotex* or whether there were any disputed issues of fact, but proceeded directly to evaluate the plan administrator's actions.  *Mordecai*, therefore, does not assist in the analysis of the proper standard of review for the district court on summary judgment.

proceed to analyze the plan administrator's actions in accordance with *Williams* — an analysis which may apply the very standard of review that applies at trial.

Applying Fed.R.Civ.P. 56 (c), summary judgment is appropriate if the record on file shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  The moving party bears the initial burden of showing the Court, by reference to record on file, that there are no genuine issues of material fact that should be decided at trial.  *Celotex* , 477 U.S. at 323; *Jeffery v. Sarasota White Sox*, 64 F.3d 590, 593 - 94 (11th Cir. 1995);  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991).

A moving party discharges its burden on a motion for summary judgment by showing the Court that there is an absence of evidence in the record to support the non-moving party's case. *Celotex*, 477 U.S. at 325.  Rule 56 permits the moving party to discharge its burden without supporting affidavits, and to move for summary judgment on the case as a whole or on any claim. *Id.*  When a moving party has discharged its burden, the non-moving party must then "go beyond the pleadings," and designate specific facts showing that there is a genuine issue for trial.  *Id.* at 324.

In determining whether the moving party has met its burden of establishing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law, the Court must draw inferences from the evidence in the light most favorable to the non-movant, and resolve all reasonable doubts in that party's favor.  *Samples on behalf of Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir. 1988).  The Eleventh Circuit has explained the reasonableness standard:

> In deciding whether an inference is reasonable, the Court must "cull the universe of possible inferences from the facts established by weighing each against the abstract standard of reasonableness." The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts. When more than one inference reasonably can be drawn, it is for the trier of fact to determine the proper one.

*Jeffery v. Sarasota White Sox*, 64 F.3d 590, 594 (11th Cir. 1995), *quoting WSB-TV v. Lee*, 842 F.2d 1266, 1270 (11th Cir. 1988).

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion. *Augusta Iron & Steel Works v. Employers Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988). A dispute about a material fact is "genuine" if the "evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The inquiry is "whether the evidence presents a sufficient disagreement to require submission to [the trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. On a summary judgment motion, the district court may not weigh the credibility of the parties. *See Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1531 (11th Cir. 1987). If the determination of the case rests on which competing version of the facts or events is true, the case should be presented to the trier of fact. *Id.*

-11-

III.    **APPLICATION AND ANALYSIS**

    A.    **THE FACTS**

        1.    **The Plan Documents**

            a.    The Plan

The parties refer to the MetLife Certificate of Insurance for the Employees of Sears, Roebuck and Co., together with the attached notices and description of benefits, as the Long Term Disability Plan [the "Plan"].  Plan, Docket No. 31-5.  The Plan identifies Sears as the Employer and Plan Administrator.  Plan, Docket No. 31-6 at 11.  Under the Plan, Sears will answer questions about the Plan, and assist plan participants in filing claims.  Plan participants are to file completed claim forms with Sears.  Sears certifies that the plan participant is insured under the Plan, and then forwards the claim form to MetLife for processing.  Plan, Docket No. 31-6 at 11.

MetLife then processes the claim.  The Plan provides that:

> In order to receive benefits under This Plan, you must provide us [MetLife] at your expense, and subject to our satisfaction . . .  Evidence of continuing Disability  . . . [and]  . . .  Any other material information related to your Disability which may be requested by us.

Plan, Docket No. 31-5 at 11, 14; Plan, Docket No. 31-6 at 3.  The Plan defines "disability" for hourly employees as follows:

> "Disabled" or "Disability" means that, due to sickness, pregnancy or accidental injury, you are receiving Appropriate Care and Treatment from a Doctor on a continuing basis; and
>
> 1.    during your Elimination Period and the next 24 month period, due to your inability to perform the duties of any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings, you are unable to earn more than 80% of your Indexed Predisability Earnings from any employer in your Local Economy; or

-12-

 2. after the 24 month period, due to your inability to perform the duties of any gainful occupation for which you are reasonably qualified taking into account your training, education, experience and Predisability Earnings, you are unable to earn more than 60% of your Indexed Predisability Earnings from any employer in your Local Economy.

Plan, Docket No. 31-5 at 14.[7]

 If a claim for benefits is denied, the plan participant receives a written explanation.[8]  Plan, Docket No. 31-6 at 11.  The plan participant then may request review by MetLife.  MetLife will "re-evaluate all the information" and inform the plan participant of the decision in a timely manner.[9]  Plan, Docket No. 31-6 at 12.  For disputes arising under the Plan, service of legal process may be made upon either Sears or MetLife.  Docket No. 31-6 at 11.  Sears reserves the right to change the Plan or terminate it.  Plan, Docket No. 31-6 at 13.

 The portion of the Plan captioned "Certificate of Insurance" states that "MetLife in its discretion has authority to interpret the terms, conditions, and provisions of the entire contract.  This includes the Group Policy, Certificate, and any Amendments."  Plan, Docket No. 31-5 at 3.  Another portion of the Plan captioned "Discretionary Authority of Plan Administrator and Other Plan Fiduciaries," however, arguably provides that both Sears (the Plan Administrator) and

---

[7]MetLife paid Rementer benefits through the first 24-month phase when the earnings requirement was 80%, and then terminated her benefits upon the transition to the phase with the lower, 60%, earnings requirement.

[8]Every plan must provide "adequate notice in writing to any participant or beneficiary whose claim of benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant."  29 U.S.C. § 1133 (1).  MetLife's obligation with respect to the manner and content of notification of an adverse benefit determination is governed by 29 C.F.R. § 2560.503-1 (g).

[9]Every plan must "afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim."  29 U.S.C. § 1133 (2).  MetLife's obligation with respect to the appeal of an adverse benefit determination is governed by 29 C.F.R. § 2560.503-1 (h).

MetLife (the other Plan fiduciary) have the discretionary authority to interpret the Plan, and to

determine eligibility for benefits:

> In carrying out their respective responsibilities under the Plan, the Plan
> administrator and other Plan fiduciaries shall have discretionary authority to
> interpret the terms of the Plan and to determine eligibility for and entitlement to
> Plan benefits in accordance with the terms of the Plan.  Any interpretation or
> determination made pursuant to such discretionary authority shall be given full
> force and effect, unless it can be shown that the interpretation or determination was
> arbitrary and capricious.

Plan, Docket No. 31-6 at 12.  The parties, however, agree that Sears has limited responsibilities

under the Plan, and that MetLife has sole responsibility for claims review, including appeals.

### B.      The Summary Plan Description

The parties also refer to the Summary Plan Description ["SPD"], a weighty booklet titled

"Sears Benefits Handbook 2001 - 2002," that summarizes the entire Sears Benefits Program.  *See*

SPD, Docket No. 31-2 and following, and Docket No. 31-4 at 18.  The SPD states that MetLife is

the Claims Administrator and Insurer of the LTD Plan.  SPD, Docket No. 31-4 at 9.  Under

General Administrative Information, the SPD states that the LTD Plan is an insurance contract

funded solely by associate contributions, in which the insurance company pays the benefits,

administers the claims, and has fiduciary responsibility.  SPD, Docket No. 31-3 at 5.  The SPD,

however, is ambiguous about what discretion Sears retains solely to itself as Plan Administrator,

and what discretion it delegates to its appointees.[10]  SPD, Docket No. 31-3 at 6.  Moreover, the

---

[10]The SPD contains the following section captioned "A Note About the Plan Administrator:"
> The Plan Administrator, or the entity to which the Plan Administrator has delegated such
> responsibility, has the sole discretionary authority to determine eligibility for benefits under the plans, to
> determine the amount and form of benefits payable under the plans, to construe the terms of the plans, and
> to make factual determinations about all plan matters.  The decisions of the Plan Administrator or its
> delegate will be final and binding.
> The Plan Administrator may appoint one or more persons to carry out the responsibilities for

SPD discloses the following definition of "disabled" for hourly employees — a definition that is more stringent than the definition of "disabled" in the Plan:

> During the Waiting Period and thereafter, you are Incapable of Performing the material duties of any gainful occupation for which you are reasonably qualified based on your training, education and experience.

SPD, Docket No. 31-2 at 10, 17.[11]   The SPD warns Sears employees, however, that the SPD booklet is not a legal benefit plan document, and that the text of the plan documents and insurance policies will govern if they conflict with the SPD booklet.  Docket No. 31-4 at 14, 18.  Moreover, the parties do not contest that MetLife applied the Plan's less stringent definition of disability. Docket No. 32-4 at 4.

## 2.   Approval of Plaintiff's STD and LTD at the 80% Level

Although the Administrator's Record  [filed in paper format at Docket No. 34 and cited as "AR _" with page number] does not contain Rementer's application for Short Term Disability ["STD"] benefits, it is undisputed that she applied for such benefits.  On May 21, 2001, MetLife

---

performing certain duties of the Plan Administrator under the terms of the plans and may seek such expert advice as the Plan Administrator deems reasonably necessary with respect to the plans.  The Plan Administrator will be entitled to rely upon the information and advice furnished by such delegate(s) and experts, unless actually knowing such information and advice to be inaccurate or unlawful.

In carrying out their respective responsibilities under the plans, the Plan Administrator or its delegate(s) shall have full discretionary authority to determine eligibility for plan benefits, to make factual findings and to interpret the terms of the plans.  Any interpretation or determination made pursuant to such discretionary authority shall be given full force and effect, unless it can be shown that the interpretation or determination was arbitrary and capricious.  Benefits under the plans will be paid only if the Plan Administrator decides in its discretion that the applicant is entitled to them under the terms of the plans.

In addition to the Plan Administrator, Sears has retained claims administrators (as shown later in this section) to administer claims for benefits and to provide certain services under the plans.  The claims administrators will authorize payment of claims or services in accordance with the plans, but are not insurers of the plans; they provide only administrative services for the plans.  Sears is responsible for funding the benefits under the self-funded plans as long as they are in effect.

SPD, Docket No. 31-3 at 6.

[11]The SPD defines the "Waiting Period" as a disability lasting for 140 days within any 180 consecutive-day period. *Id*.

approved Rementer for STD benefits effective February 17, 2001, and lasting through June 22, 2001.  AR 7.  At some point, the maximum date for STD benefits was extended to August 17, 2001.  AR 32.

The medical records predating MetLife's approval of Rementer's STD came from Rementer's treating physician, Dr. Jonathan Orwitz.  On February 19, 2001, Dr. Orwitz stated that Rementer was being treated for cervical myelopathy, and restricted her from lifting more than five pounds at work.  AR 1.  Subsequently, on March 14, 2001, Dr. Orwitz increased Rementer's lifting restriction to ten pounds and stated she could perform light duty work.  AR 5.

On June 21, 2001, one day before Rementer's STD benefits initially were to expire, another of Rementer's treating physicians, Dr. Robert E. Stedman, provided MRI reports dated October 11, 2000, and December 18, 2000.  AR 13.  On June 22 and June 26, 2001, MetLife requested that Dr. Stedman complete an Attending Physician Statement ["APS"] for MetLife to verify Rementer's continued disability.  AR 18-19.  In an undated APS sent to Metlife on June 26, 2001, Dr. Stedman responded that Rementer's condition was unchanged, that she could not lift, but she could perform a light duty job.  AR 20.  A second undated and unsigned APS,[12] contains contradictory information, at one point stating Rementer can work 0 hours per day, and at another point stating Rementer may return to gainful employment if it does not involve lifting.  AR 24.

In early July 2001, MetLife sent Rementer a notice that stated the maximum duration date of her STD benefits was August 17, 2001, and sent her information to apply for LTD benefits.  AR 32-34.  Rementer was advised to submit the information by July 21, 2001, or her claim may be

---

[12] Although the APS is unsigned, it appears to be part of documents Rementer submitted to MetLife on or about July 12, 2001.  See AR 21-28.

denied.  AR 34.   On August 21, 2001, MetLife requested updated medical information to review

Rementer's LTD claim.  AR 38.  Although the Administrative Record does not reflect what

medical information was sent at the time, MetLife approved Rementer's LTD claim on September

6, 2001, effective as of July 5, 2001.  AR 44-46.

On November 10, 2001, the Social Security Administration issued a letter stating that it

found Rementer had become disabled under their rules on August 21, 2001, and approved

Rementer for benefits beginning February 2002.  AR 56.  Neither the letter not the Administrative

Record states the basis of the Social Security Administration ruling.

On March 29, 2002, MetLife requested updated medical information from Dr. Stedman.

AR 57-58.  Dr. Stedman completed an APS on or about March 30, 2002, in which he stated

Rementer could work two to three hours per day and that she suffered severe neck pain.  AR 059-

061.  Dr. Stedman did not advise Rementer to stop working but explained that, when the employer

received the letter from Dr. Orwitz restricting Rementer from lifting more than five pounds, the

employer told Rementer there was no work for her.  AR 059.  Dr. Stedman stated he expected no

improvement of the area.  AR 60.

On April 22, 2002, Rementer's medical records were reviewed by an independent

physician consultant, Dr. Mark Moyer, board certified in internal medicine.  Based on the

available records, Dr. Moyer concluded that, although Rementer could not return to her former

job, she could return to purely sedentary work.  AR 72.  Dr. Moyer did not limit the number of

hours Rementer could perform sedentary work.  AR 71-72.

On or about May 5, 2002, Dr. Moyer supplemented his April report by providing details of a conversation Dr. Moyer had with Rementer's treating physician, Dr. Stedman.[13] AR 75-76. Dr. Stedman, who completed the above referenced APS on March 30, 2002, advised Dr. Moyer that he had not actually seen Rementer with regard to neck pain since December 2000 or January 2001.  AR 75.  Both Dr. Stedman and Dr. Moyer agreed that Rementer would not be able to return to her previous position as a parts associate because it required heavy lifting.  However, Dr. Stedman expressed to Dr. Moyer that he did not see any reason why Rementer could not return to a purely sedentary position, so long as lifting and carrying requirements were no more than ten pounds:  "[h]e felt she would be perfectly capable of doing office related tasks and answering phones for example."  *Id.*

On May 17, 2002, MetLife had a transferable skills analysis ["TSA"] performed on Rementer.  The TSA report identified several sedentary positions for which Rementer would be qualified based on her training, education and experience; however, the earnings potential for these positions fell below the 80% requirement.  AR 079-080.  Accordingly, based on the medical information and the TSA report, MetLife continued to approve Rementer for LTD benefits through the first 24-month phase, which included the 80% earnings requirement.

MetLife advised Rementer by letter dated March 4, 2003 that her LTD claim was currently approved based upon the 80% earnings requirement, and further advised that after July 4, 2003, MetLife would be determining Rementer's continued entitlement to benefits under the 60%

---

[13]Dr. Moyer also attempted to speak with Dr. Orwitz by telephone.  Dr. Orwitz, however, declined to speak with him and requested that any inquiries be made in writing.  AR75, 78.  The claims adjuster sent a narrative to Dr. Orwitz on May 15, 2002.  AR201.  The record does not indicate that Dr. Orwitz responded.

earnings requirement.  MetLife requested that she provide updated medical records.  AR 81.  The

letter further required Rementer to submit updated medical information by March 28, 2003.  *Id*.

By letter dated April 23, 2003, MetLife advised Rementer that MetLife had not received the

additional medical documentation it had requested from Rementer, and informed her that benefits

would be terminated as of May 30, 2003, if she did not submit the requested documentation by

May 22, 2003.  AR 83.

On May 13, 2003, Rementer submitted medical records from Dr. S. Manzoor Abidi, a

neurologist.  AR 93-98.  In his April 24, 2003 report to Dr. Stedman, Dr. Abidi noted that

Rementer's main symptom was lower back pain as "her neck symptoms certainly have improved"

since the examination by Dr. Orwitz back in 2001.  AR 93-94.  He further reported that her neck

was supple with no limitation in range of motion and "no evidence clinically of cervical cord

compression and, therefore, she seems stable in that area."  AR 94.  Dr. Abidi's motor

examination revealed mild weakness of the left extensor hallucis longus, but all other muscles

showed full strength.  AR 94.  There was also hypalgesia of the left lateral part of the distal lower

extremity and some of the left foot.  *Id.*

Dr. Abidi ordered an MRI of the lumbar spine and an EMG nerve conduction study of the

lower extremities.  The MRI performed on April 29, 2003, revealed a "mild bulging disc at L2/3,"

"mild narrowing of the left neural foramen by a small left herniated disc" at L5/S1, and a "mild

bulging disc with mild narrowing of the bilateral neutral foramina" at L4/5.  AR 96-97, 198.  The

EMG performed on April 23, 2003, revealed normal distal motor latency on the left and right with

amplitude of motor action potential slightly reduced on the left.  AR 98.  Distal sensory latencies

on both sides were normal and latencies of the H-reflexes were normal in both legs.  *Id.*  The

conclusion was normal for the right extremity and "mild degree of left L5-S1 lumbosacral

radiculopathy" shown by an "increased proportion of polyphasic motor unit potential" in the left

hamstring and left calf muscles.  AR 98, 198.

In May 2003, Rementer also provided a completed Activities of Daily Living form in

which she reported that she exercised each morning with a physical therapist, went out with her

boyfriend daily, and occasionally engaged in walking and swimming.  AR 85-89.

### 3.      Denial of LTD at 60% Level

According to MetLife, it began reviewing Rementer's claim in May 2003 in anticipation of

the transition to the Plan's 60% earnings requirement, which would go into effect in July 2003.  A

nurse consultant reviewed Rementer's records, and identified the need for APS forms to determine

Rementer's restrictions and limitations from occupations outside of the "heavy" category.  AR

198.  Neither Dr. Abidi nor Dr. Stedman submitted updated APS forms.  In August 2003, the

nurse consultant learned from Dr. Abidi that he had not seen Rementer since April 30, 2003.  AR

197.

By letter dated September 2, 2003, MetLife informed Rementer that it was continuing to

review her claim and requested additional medical documentation.  AR 100.  The letter further

advised Rementer that she must submit the requested documentation by October 2, 2003, or her

claim would be terminated for failing to provide proof of disability.  Rementer confirmed during a

telephone conversation with MetLife on September 10, 2003, that she was no longer seeing a

neurologist and was not even being followed by her primary care physician, Dr. Stedman.  AR

196.

Rementer failed to submit any additional documentation, and MetLife terminated her

benefits effective October 15, 2003.  AR 195.  After several telephone conversations with

Rementer following the termination, MetLife agreed to allow Rementer until November 21, 2003,

to submit the additional medical records that she claimed existed.  AR 101.

On November 4, 2003, Rementer submitted one additional medical record, a letter from

Dr. Abidi to Dr. Stedman dated May 7, 2003, providing a summary of his treatment of Rementer.[14]

AR 112-113.  Dr. Abidi confirmed that the MRI of the lumbar spine performed on April 29, 2003,

demonstrated a mild narrowing of the left neural foramina at the L4,5 level and a small herniated

disk and the EMG study showed mild left-sided L5,S1 radiculopathy.  AR 112.  He commented

that Rementer did not tolerate physical therapy or the medications he had prescribed and advised

that, as he did not feel he could be of any further benefit to Rementer, he had discharged her from

his care.  AR 113.  He recommended that Dr. Stedman refer Rementer to a spine surgeon to "see if

they could be of any further help."  *Id.*

Following its receipt of the additional documentation submitted by Rementer, MetLife had

the entire file reviewed by a nurse consultant.  AR 188-89.  The nurse consultant acknowledged

that there was a mild narrowing of the left neural foramen and a small herniated disc but that these

conditions did not create a physical impairment of such severity as to preclude the ability to

perform sedentary work.  AR 188-89.

------

[14]Rementer also submitted an insurance account statement showing services paid for in April and May 2003, and a CT scan from May 2003 that was already contained in the record.  AR 104-108.

On November 20, 2003, MetLife also had another TSA performed.   AR 120-21.  MetLife instructed the vocational expert who conducted the TSA to use only the Physician Consultant Review dated May 5, 2002, by Dr. Moyer to determine Rementer's exertion level.  AR 120.[15] MetLife's Nurse Consultant, who reviewed Dr. Moyer's Physician Consultant Review, stated that sedentary work was recommended.  AR 120.  The vocational expert, therefore, reviewed sedentary level jobs defined by the U.S. Department of Labor, and concluded that there were four job titles that Rementer could perform, and that these jobs existed within a 60-mile radius of Rementer's home.  AR 121.  Although it is not expressly stated in either Dr. Moyer's report or the vocational expert's report, Rementer argues that both Dr. Moyer and the vocational expert assumed Rementer could perform sedentary work full-time.

Based upon the most recent reports and the record as a whole, MetLife determined that Rementer did not meet the definition of disability with the Plan's 60% earnings provision. MetLife notified Rementer by letter dated December 11, 2003 that her benefits were terminated effective October 15, 2003.  AR 124-28.

### 4.      Review and Decision on Appeal

By letter dated May 20, 2004, Rementer appealed MetLife's decision.   AR 154-161. Rementer's contentions on appeal were:

1.) MetLife determined that Rementer could not earn more than 60% of her predisability earnings as evidenced by the fact that MetLife continued to pay Rementer benefits during the transition period from July 3, 2003 to October 15, 2003.  Rementer, therefore, contends that the

---

[15]Dr. Moyer's report is located at AR73-74.

only issue is whether something happened on or about October 15, 2003, that would support

MetLife's change in position.

2.) Rementer's medical condition is worse, not better.

3.) There is no evidence that Dr. Stedman ever changed his position that Rementer could

work, at most, two to three hours per day.  Rementer only could have earned 60% of her

predisability income if she worked full-time.  The TSA, therefore, was performed on a faulty

assumption.

4.) MetLife failed to consider that Rementer was awarded Social Security disability

benefits, which requires one to be disabled from "any" occupation.

In support of her appeal, Rementer also submitted a copy of an MRI report dated June 6, 2003.

AR 154-161.  Notably, the MRI showed that the disc herniation at C3-4 had decreased in size

since the previous MRI taken in December 2000.  *Cf.* AR 64 - 65 and 160.

MetLife then submitted Rementer's entire file for review by an independent consulting

physician, Dr. Valerie Ito, board certified in physical medicine and rehabilitation.  AR 170-75.

Dr. Ito concluded that Rementer was limited to sedentary work, with no lifting greater than ten

pounds, and restrictions as to: "repetitive push-pull, walking on uneven surfaces, climbing,

stooping and crawling, overhead work and work requiring rapid or quick neck rotation, extension,

or bending and prolonged sitting [without being able to change positions]."  AR 175.  Dr. Ito

stated, however, that "the objective medical would support pain could be a limiting factor for

consistency in terms of these activities, intolerance to physical therapy and medications."  AR 175

Dr. Ito further stated that Rementer's pain "is subjective in nature in terms of severity."   AR 175.

Following its complete review on appeal, including review of Dr. Ito's report, MetLife

notified Rementer by letter dated June 29, 2004 that it was upholding the decision to terminate

benefits.  AR 177-180.  Rementer filed this lawsuit on July 27, 2004.

## B.     ANALYSIS

### 1.     Application of the *Celotex* Standard

The Court first applies the *Celotex* standard under Rule 56, and construes the evidence in

the Claims Administrator's record in a light most favorable to the non-moving party.  In her

motion for summary judgment [29], Rementer contends that she remains "disabled" at the 60%

level within the meaning of the Plan, and that the Administrator's Record before MetLife shows

no material issue of fact as to her continuing disability.  Construing the evidence in the

Administrator's Record in a light most favorable to MetLife, the non-moving party, Rementer's

motion for summary judgment should be denied.  There is conflicting evidence in the

Administrator's Record, and a material issue of fact as to her continuing disability as defined in

the Plan.

Similarly, in its cross motion for summary judgment [30], MetLife contends that Rementer

is no longer "disabled" at the 60% level within the meaning of the Plan, and that the

 Administrator's Record before MetLife shows no material issue of fact as to the absence of a

continuing disability.  Construing the evidence in the Administrator's Record in a light most

favorable to Rementer, the non-moving party, MetLife's cross motion for summary judgment

should be denied.  There is conflicting evidence in the Administrator's Record, and a material

issue of fact as to Rementer's continuing disability as defined in the Plan.  Nevertheless, it does

-24-

little good for the parties and the trial judge to conclude this Court's pretrial analysis without having applied the very standard of review applicable at trial.

### 2.    Application of the *Williams* Standard

Having completed its analysis under the Rule 56 summary judgment standard, the Court now proceeds to analyze the plan administrator's actions in accordance with *Williams*.  As requested by the parties, the Court construes the cross motions for summary judgment as cross motions for final judgment.  *See Providence*, 375 F.Supp. 2d at 1342 n.1 (Judge Whittemore); *Bruce*, Case No. 04-cv-482-Orl-22JGG, Docket No. 31 at 30 (Judge Conway); *Smorto*, 2005 WL 1227713 at *6 (Judge Presnell); *accord, Curran*, 2005 WL 894840 at *7 - *9.

First, this Court considers *de novo* whether MetLife's benefits-denial decision is "wrong" (*i.e.*, whether the court disagrees with MetLife's decision).  In order to receive benefits under the Plan, Rementer must provide MetLife with evidence of her continuing disability subject to MetLife's satisfaction, as well as any other material information related to her disability which MetLife may request.  Plan, Docket No. 31-5 at 11, 14; Plan, Docket No. 31-6 at 3.

MetLife properly sought to determine whether Rementer remained "disabled" within the meaning of the Plan.  Specifically, MetLife properly sought to determine whether, due to an inability to perform the duties of any gainful occupation for which she was reasonably qualified, Rementer was unable to earn more than 60% of her indexed pre-disability earnings from any employer in her local economy.  Plan, Docket No. 31-5 at 14.  In making that determination, MetLife sought the expert opinion of Allen R. Searles, a Vocational Rehabilitation Consultant. AR 120.

As requested by MetLife's Case Management Specialist, however, Searles determined Rementer's exertional level *only* from the opinion of Dr. Mark A. Moyer, MetLife's consultant. According to Dr. Moyer, Rementer could return to a "purely sedentary position where lifting and carrying was limited to not more than 10 pounds." AR 120.  It is unclear from the record why the Case Management Specialist directed Searles not to consider other evidence, such as the opinions of Rementer's treating physicians. AR 120.  Based on Rementer's age (age 57 in 2003), transferable skills, and Dr. Moyer's opinion that she could do purely sedentary work, Searles opined that Rementer was qualified for four alternate occupations.

Searles concluded that the four occupations "do exist" because a Yellow Pages computer program ("Labor Market Analysis") indicated that potential employers for these occupations exist in Rementer's local area. AR 121.  On December 11, 2003, Case Manager Specialist Sharon D. Muldrow therefore concluded that Rementer was not disabled because she was able to perform sedentary work, and was qualified and able to perform four alternate sedentary occupations that exceed 60% of her indexed pre-disability earnings. AR 127.  But Muldrow's December 11, 2003, decision was not MetLife's final decision, and is not the decision now subject to judicial review.

MetLife considered additional evidence on appeal.  Vincent Macalone, a MetLife Procedure Analyst, considered that evidence, and then rendered a final decision on June 29, 2004. Docket No. 32-5 at 17 - 19.  The final decision credits the opinion of MetLife's "onsite" physician consultant, Dr. Valerie Ito, who is board certified in physical medicine and rehabilitation.  AR 170-75.

Dr. Ito's opinion of Rementer's capacity to work is more limited than Dr. Moyer's broad "purely sedentary" opinion.  Although Dr. Ito agreed that Rementer was limited to sedentary work with no lifting greater than ten pounds, Dr. Ito also imposed the following additional restrictions: "repetitive push-pull, walking on uneven surfaces, climbing, stooping and crawling, overhead work and work requiring rapid or quick neck rotation, extension, or bending and prolonged sitting [without being able to change positions]."  AR 175.  Dr. Ito further observed that "pain could be a limiting factor for consistency in terms of these activities, intolerance to physical therapy and medications."  AR 175.  MetLife never re-presented these restrictions to a vocational expert.  No vocational expert ever opined that a person with such additional limitations actually could work full time at the four alternate sedentary occupations that exist locally.

This Court imposes no heightened burden of explanation on a claims administrator who, without explanation, may have rejected its own in-house expert's medical opinion as to a plan participant's abilities and limitations.  Neither does this Court import into ERISA any standards applicable to Social Security disability cases, such as the requirement that the Commissioner prove the existence of jobs that actually exist, or explain reasons for discounting evidence.  *See Black & Decker,* 538 U.S. at 831 - 32.  Nevertheless, it seems *de novo* wrong to rely on a vocational expert's opinion that was based on lesser restrictions than those applicable to the plan participant.[16]  Therefore the Court cannot end the inquiry at the first stage.

---

[16]By "de novo wrong," this Court does not mean that Rementer is, in fact, "disabled" within the meaning of the Plan. The decision is wrong in the sense that this Court would reverse and remand the case for reconsideration had it come to this Court in the context of an appeal from the denial of Social Security disability benefits.  The Middle District of Florida has on one occasion "remanded" such a decision to MetLife for further proceedings pending a stay, *Bruce v. Metropolitan Life Ins. Co.*, Case No. 6:04-cv-482-Orl-22JGG (M. D. Fla. September 28, 2005)(Hon. Anne C. Conway)(Docket No. 31 at 30), but this Court's authority to do so is untested and without statutory basis.  Remand is not the recommendation here.

Second, because MetLife's decision is "*de novo* wrong," this Court next determines

whether MetLife was vested with discretion in reviewing claims.  The portion of the Plan

captioned "Certificate of Insurance" states that "MetLife in its discretion has authority to interpret

the terms, conditions, and provisions of the entire contract.  This includes the Group Policy,

Certificate, and any Amendments."  Plan, Docket No. 31-5 at 3.  The Plan therefore vests MetLife

with sufficient discretion, and the Court cannot end the inquiry at the second stage.

Third, because MetLife's decision is "*de novo* wrong" and MetLife was vested with

discretion in reviewing claims, then this Court determines whether "reasonable" grounds

supported it.  In other words, this Court reviews MetLife's decision under the deferential arbitrary

and capricious standard.

There are reasonable grounds in the record to support MetLife's denial of benefits, as

stated by Vincent Macalone in this final decision on appeal dated June 29, 2004.  Applying the

deferential standard, Rementer failed to prove that she has limitations that exceed the limitations

described by Dr. Ito and relied on by Macalone in MetLife's final decision on appeal.  Docket No.

32-5 at 18.  Rementer's neck condition had improved by 2003, and her treating physicians did not

consider her back condition as disabling her from sedentary work.  AR 93 - 94, 188 - 89, 175.  It is

true that MetLife's final decision fails to make clear findings as to Rementer's actual residual

functional capacity, limitations, and restrictions; fails to articulate its reason for inferring that

Rementer can do sedentary work full time; relies on a weak methodology for its "Labor Market

Analysis;" and fails to obtain a new vocational expert opinion that considers Dr. Ito's added

restrictions.  Nevertheless, neither the ERISA statute nor the Plan contain any express requirement that MetLife do so.

Rather, under the Plan, it is Rementer who must provide evidence of continuing disability to MetLife — at her own expense and subject to MetLife's satisfaction — as well as any other material information that MetLife may request.  *See* Plan, Docket No. 31-5 at 11, 14; Plan, Docket No. 31-6 at 3.  Rementer never provided MetLife with her own expert opinion that a person with her limitations could not perform alternative work, or that sedentary work for a person with her limitations does not exist locally.  Reasonable grounds support MetLife's denial.

Fourth, because reasonable grounds exist in the record to support MetLife's finding of no disability, this Court next determines whether MetLife operated under a conflict of interest.  MetLife argues that, because MetLife is a fiduciary, this Court should defer completely to MetLife's final decision, as if this were an appeal from the decision of an impartial judge based on an administrative record.  Although some deference is proper (heightened arbitrary and capricious review), the Court declines to defer to the full extent requested by MetLife (arbitrary and capricious review).  There is a significant difference between the reasoned decision of an impartial administrative law judge who applies a detailed code of federal regulations, and the letter ruling of a claims adjudicator employed by an interested insurance company.

According to the SPD, the Plan is an insurance contract funded solely by associate contributions, in which MetLife pays the benefits, administers the claims, and has fiduciary responsibility.  SPD, Docket No. 31-3 at 5.  Although the Plan and the SPD do not state that MetLife pays claims out of its own assets, the issue is not in dispute.  As a fiduciary, MetLife must

"discharge its duties with respect to the plan solely in the interest of the participants and beneficiaries." *See* 29 U.S.C. §§ 1004 (a) and 1109.  In other words, MetLife's own financial interest can play no role whatsoever in the discharge MetLife's duties to fairly review claims, including Rementer's claim.  A conflict of interest therefore exists in this case — a conflict between MetLife's fiduciary duty to the plan participants under ERISA and MetLife's own financial interest in minimizing payments on claims.

Fifth, because there is a conflict, this Court cannot end the inquiry and affirm MetLife's decision at the fifth stage.  Rather, the Court proceeds to the sixth stage and applies heightened arbitrary and capricious review to MetLife's decision.  The burden has shifted to MetLife to prove that its denial of benefits in this case was not tainted by self-interest.  MetLife has done so.

A wrong but apparently reasonable interpretation is arbitrary and capricious if it advances MetLife's conflicting interest at Rementer's expense, unless MetLife justifies the interpretation on the ground of its benefit to the class of all plan participants or standard practice.  MetLife seems to have denied Rementer's claim in good faith based on a review by a nurse consultant and an independent physician consultant who found that Rementer's medical condition in 2003 was not disabling.  MetLife seems to have followed its standard procedures, such as they are, in resolving Rementer's claim.  This Court cannot require MetLife to follow procedures that model the Social Security disability regulations.

MetLife also is makes a theoretical argument, that is supported only by common sense and not evidence.  MetLife argues that a fair decision to deny benefits will benefit all plan participants because the cost of LTD benefits would surely go up (or benefits would be reduced) if benefits are

-30-

paid to employees who fail to satisfy the terms of the Plan.  MetLife correctly notes that plan participants do not want "to subsidize a co-worker's early retirement under the guise of disability." Docket No. 30 at 19 - 20.  Although the burden rests with MetLife, Rementer has made no showing that MetLife's decision was not made in good faith.  According the required deference, MetLife's decision should be upheld.  Even a conflicted administrator should receive deference when it demonstrates that it has exercised discretion among choices which reasonably may be considered to be in the interests of the participants.

## IV.   CONCLUSION

For the reasons stated above, it is recommended that the cross motions for summary judgment each be treated as motions for final judgments, and that Rementer's motion for final judgment [29] be **DENIED** and MetLife's motion for final judgment [30] be **GRANTED**.

Failure to file written objections to the proposed findings and recommendations in this report pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 6.02 within ten days of the date of its filing shall bar an aggrieved party from a *de novo* determination by the district court of issues covered in the report, and shall bar an aggrieved party from attacking the factual findings on appeal.

**DONE** and **ORDERED** in Orlando, Florida on December 9, 2005.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties

-31-